UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 14-1833(DSD/JJK)

Catherine Rose Smith,

        Plaintiff,

v.                                              **ORDER**

Mayo Clinic,

        Defendant.


     Stacey R. Everson, Esq., Stephen W. Cooper, Esq. and The
Cooper Law Firm Chartered, Loring Green East, 1201 Yale
Place, Suite A-100, Minneapolis, MN, counsel for plaintiff.

     George R. Wood, Esq. and Littler Mendelson, PC, 80 South
Eighth Street, Suite 1300, Minneapolis, MN 55402, counsel
for defendant.


     This matter is before the court upon the motion for summary
judgment by defendant Mayo Clinic. Based on a review of the file,
record, and proceedings herein, and for the following reasons, the
court grants the motion in part and denies the motion in part.


**BACKGROUND**

     This employment dispute arises out of plaintiff Catherine
Smith's eventual termination from Mayo. Smith is an African
American woman who suffers from cervical stenosis and fibromyalgia.
Pl.'s Opp'n Mem. Ex. A.

## I.  Employment History

     From 2006 through 2012, Smith worked for Mayo's Cancer
Clinical Research Office. Smith Dep. at 189:18-25; Hurtis Dep. at

241:2-5; Pl.'s Opp'n Mem. Ex. U.  Smith began as a CP Data Clerk, became a Risk Protocol Specialist (RPS), and then a Document Control Specialist.  Smith Dep. at 46:14-47:14.  Throughout her employment she received satisfactory performance reviews.  Pl.'s Opp'n Mem. Ex. Q.

In mid-2012, Nicole Knutson[1] informed Smith that Mayo was eliminating Smith's position and that she should start looking for a new job.  Smith Dep. at 60:2-62:4.  When Smith contacted HR, however, she discovered that she qualified for an automatic promotion to a new position, RPS II.  Id. at 207:4-6.  After her promotion, Cindy Reed, a Senior Program Coordinator in the Cancer Office, supervised Smith.  Id. 48:17-19; Pl.'s Opp'n Mem. Ex. U.

## II.  Attendance Policy

On September 26, 2012, Mayo established a new attendance policy.  Wood Aff. Ex. F.  The new policy gave supervisors discretionary authority to dispense "occurrences" to an employee when she was late or absent from work without prior permission. Smith Dep. at 215:17-25; Knutson Dep. at 101:17-103:10.  The policy allows for termination of an employee with ten occurrences within a twelve-month period.  Id. Exs. E & F.

---

[1] Knutson is a Program Manager in the Cancer Office.  Pl.'s Opp'n Mem. Ex. U.

### III.  Instances of Alleged Racial Animus

In September 2012, Smith filed a report of discrimination with HR.  Smith Dep. at 120:13-126:11.  That report included allegations that Reed and Karen Hurtis[2] made racially charged and disparaging comments.  For example, Smith alleged that in mid-2012, Reed and Hurtis referred to Smith as "you people" and a "product of [her] environment."  Smith Dep. at 165:23-166:5.  Smith also alleged that, around the same time, Hurtis described President Obama as a "sock monkey" and said that Michelle Obama looked like a man.  Id. at 168:10-14.

Smith told Hurtis that she would be filing a report based on their comments.  Smith Dep. at 207:11-20.  On September 26, 2012, after Smith filed her report, Reed and Kelly Paulson[3] called Smith into a meeting.  Id. at 73:16-75:3.  According to Smith, Reed and Paulson warned her that she would face negative consequences if she filed any more reports against her supervisors.  Id.  Hurtis then hung a poster on her door depicting a kitten looking through the scope of a high-powered rifle, captioned, "The day the barking stopped."  Pl.'s Opp'n Mem. Ex. K.  In reference to the poster, Hurtis told Smith, "This is what we do to barking dogs in our

---

[2] Hurtis was a supervisor for a different division who supervised Smith before her promotion.  Pl.'s Opp'n Mem. Ex. U; Smith Dep. at 207:11-16.

[3] Paulson is the Manager of Research Operations and in charge of the Cancer Office.  Pl.'s Opp'n Mem. Ex. U.

neighborhood." Smith interpreted that statement as a warning not to complain again. Smith Dep. at 192:17-195:13.

## IV.  Alleged Retaliation

Before her report, none of Smith's supervisors had given her any occurrences or imposed disciplinary corrective action. Id. at 189:18-25; Hurtis Dep. at 241:2-5. After the report, however, Smith alleges that Reed gave her occurrences that were unwarranted and under circumstances where other employees went unpunished.[4] See, e.g., Smith Dep. at 177:7-178:24. For example, Reed gave Smith two occurrences when she missed two consecutive work days; Smith alleges that the absences should have resulted in only one occurrence. Pl.'s Opp'n Mem. Ex. O; Reed Dep. at 258:12-259:17. Smith also asserts that Reed did not give occurrences to employees who consistently showed up a half hour late or not at all. Smith Dep. at 215:9-16. By contrast, Reed gave Smith an occurrence for being one minute late. Pl.'s Opp'n Mem. Ex. O. Smith also asserts that another coworker under Reed's supervision would mark the same start time for each day, even if the coworker was late, but Reed never gave her an occurrence. Smith Dep. at 215:9-25.

Smith also alleges that Reed began to overload her with files so that she would underperform. Specifically, on October 1, 2012, Reed assigned Smith a recently departed coworker's caseload. Pl.'s

---

[4] Smith has not provided specific evidence to support her assertions regarding under what circumstances Reed gave occurrences to other employees or those employees' time-entry habits.

4

Opp'n Mem. Ex. N; Hurtis Dep. at 220:2-222:5.  It is undisputed that this made "Smith's workload ... heavier than other[s]." Hyberger Aff. ¶ 7.  Despite her elevated work level, Smith completed the additional work in a timely fashion.  Hurtis Dep. at 220:2-226:13.  In fact, Mayo does not point to a single instance where Smith failed to complete her work on time.  <u>See</u> Knutson Dep. at 341:22-25.

On discovering that Smith had completed the files, Hurtis sent an email to Reed on October 28, 2012, stating that she "want[ed] to kill [Smith]."  <u>Id.</u> at 222:1-5; Pl.'s Opp'n Mem. Ex. M.  Reed accidentally included the message in a department-wide email the next day.  Pl.'s Opp'n Mem. Exs. M.  Smith reported the email to human resources, stating that she felt threatened and offended by Hurtis' unprofessional choice of words.  Smith Dep. at 97:17-98:1, 100:11-101:14.

Thereafter, Smith alleges that Ines Guevara, an HR representative, told her that Reed, Hurtis, and Knutson wanted her to be fired.  Specifically, Smith alleges that when she met with Guevara to discuss her most recent report, Guevara told her that they were "out to get" Smith.  <u>Id.</u> at 98:12-14, 101:22-102:2. Guevara tried to help Smith secure a position in a different department, but was unsuccessful.  <u>Id.</u>

After Smith's reports, Reed gave her several occurrences in quick succession, which Smith claims violated the policy or were

otherwise unfair.  <u>See</u> Pl.'s Opp'n Mem. Ex. O.  As a result of Smith's reports and Reed's subsequent treatment of Smith, Knutson replaced Reed as Smith's supervisor on November 13, 2012.  Knutson Dep. at 24:5-6; Pl.'s Opp'n Mem. Ex. O.  Knutson immediately placed Smith on a Performance Improvement Plan, drafted by Reed.  Knutson Dep. at 171:10-22; Pl.'s Opp'n Mem. Ex. Q.  Reed then withdrew Smith's invitation to Mayo's holiday party.  Smith Dep. at 190:8-18.  Reed explained that only a certain number of employees could attend, but then invited Knutson in Smith's place.  <u>Id.</u>

After the change in supervisors, Smith alleges that Mayo was supposed to remove the five occurrences that Reed had given Smith, but failed to do so.  Pl.'s Opp'n Mem. Exs. O, S, T.  Further, Knutson continued to give Smith additional occurrences.  Pl.'s Opp'n Mem. Exs. O, Q, U.  Smith's occurrences disqualified her from receiving a raise.  Smith Dep. at 189:1-4.

## V.   Smith's Termination

On July 22, 2013, Smith visited her doctor with complaints of lower back pain.  <u>Id.</u> at 247:2-249:23.  Her physician was unable to diagnose the source of the pain, but suggested that Smith undergo a CT scan to assess her kidneys.  Clarey Decl. Ex. A.  Smith went to the emergency room at St. Mary's Hospital for the CT scan.  <u>Id.</u> Ex. B.  The scan was unremarkable, however, and the hospital diagnosed her with renal pain of an unknown etiology.  <u>Id.</u> Although her treating physician saw no reason to admit her to the

6

hospital, Smith requested that she remain for observation overnight, and the physician granted her request.

The following day, Smith was absent from work and informed Knutson that she would be unable to work that day.  Pl.'s Opp'n Mem. Exs. E & O.  Smith asked Knutson to start the process for a leave request under the Family and Medical Leave Act (FMLA).  See Knutson Dep. at 326:9-327:17.  Knutson did not do so, however, and instead gave Smith her tenth and final occurrence.  Wood Aff. Ex. N; Pl.'s Opp'n Mem. Ex. O.

On July 25, 2013, Knutson, Paulson, and an HR representative met with Smith and terminated her for reaching the maximum number of occurrences allowed under the attendance policy.  Knutson Dep. at 247:7-251:24.

**VI.  Smith's Internal Appeal**

Smith appealed her termination to Mayo's internal appeals committee.  Wood Aff. Ex. M.  She focused on the events of July 22 to 25, 2013, and made only general references to retaliation by her supervisors.  Id.  The appeals committee overturned Smith's termination, concluding that Knutson failed to conduct the required investigation as to whether Smith qualified for leave under the FMLA.  Wood Aff. Ex. N.

Mayo offered Smith reinstatement and back pay.  Smith Dep. at 233:25-238:20.  However, Mayo also informed her that she would be working with the same supervisor and under the same conditions as

7

before.   Id.   Smith asked for a transfer or to work under a different supervisor, but her request was denied.   Id.   Smith declined reinstatement.   Id.

## VII. Smith's Legal Action

On February 26, 2014, Smith filed a complaint with the Equal Employment Opportunity Commission (EEOC) and the Minnesota Department of Human Rights.   Wood Aff. Ex. C.   In the EEOC complaint, Smith charged Mayo with discrimination based on race, retaliation, age, and disability.   She left boxes indicating religious discrimination and "continuing action" unchecked, instead specifying that the discrimination took place on the date of her termination, July 25, 2013.   Id.   On March 6, 2014, the EEOC dismissed Smith's charges and issued her a right-to-sue letter.[5] Id. Ex. D.

Smith commenced the instant action on July 7, 2014, alleging discrimination based on race, retaliation, age, disability, and religion.   She also alleges violations of the FMLA and that she was subjected to a hostile work environment.[6]   Mayo now moves for summary judgment.

---

[5] Nothing in the record indicates the result of Smith's complaint to the Minnesota Department of Human Rights.

[6] At oral argument, Smith's counsel noted that they are now pursuing claims only for racial discrimination, retaliation, and violation of the FMLA, and abandoning all other claims.   Mayo is entitled to summary judgment on the abandoned claims.

8

## DISCUSSION

### I.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

### II.   Racial Discrimination

A plaintiff claiming discrimination must either present direct evidence of the discrimination or satisfy the three-part burden-shifting test presented in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  Direct evidence can include "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that attitude was more likely than not a motivating factor in the employer's decision."  <u>Yates v. Douglas</u>, 255 F.3d 546, 548 (8th Cir. 2001).  However, "[n]ot every prejudiced remark made at work supports an inference of illegal employment discrimination."  <u>Rivers-Frison v. Southeast Mo. Cmty. Treatment Ctr.</u>, 133 F.3d 616, 619 (8th Cir. 1998).  Courts distinguish between "stray remarks in the workplace, ... statements by decisionmakers unrelated to the decisional process, ... [and] direct evidence of discrimination."  <u>Id.</u>

Smith has presented evidence of several comments by her coworkers and supervisors that could readily be considered racially charged.[7]  Her supervisors and coworkers, however, made those

---

[7] Mayo argues that the alleged discriminatory acts are time-barred by Title VII's requirement that a plaintiff file an EEOC charge within 300 days of the adverse employment action giving rise to the charge.  Mayo goes beyond this, arguing that no facts beyond the 300 days may be used to infer a discriminatory purpose to Smith's termination.  The Supreme Court has rejected this notion, holding that "the statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim."  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002).

statements in September 2012, seven months before Smith's termination. Mayo asserts that it terminated Smith based on her record of tardiness and absenteeism. Smith has presented no evidence indicating that the statements motivated Mayo's decision to terminate her. Smith's supervisors and coworkers made those statement well outside of any decisionmaking process regarding her termination, and Smith has not shown any connection between the events and her termination. Thus, Smith has not presented direct evidence of racial discrimination.

Absent direct evidence, the court turns to the McDonnell Douglas test, which requires that Smith first establish a prima facie case of discrimination. McDonnell Douglas Corp., 411 U.S. at 802. This requires Smith to show that she: (1) belongs to a protected group; (2) was meeting the legitimate expectations of her employer; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees. Gilmore v. AT&T, 319 F.3d 1042, 1046 (8th Cir. 2003).

It is undisputed that Smith belongs to a protected group, had satisfactory performance reviews, and was terminated. Smith has not, however, provided sufficient evidence that she was treated differently than similarly situated employees. To satisfy the fourth element, Smith "bears the burden to demonstrate by a

---

Accordingly, the court will consider the prior acts to provide context for the termination.

preponderance of the evidence that there were individuals similarly situated in all respects to her who were treated differently." Id. Those comparators must "have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." Id. Smith must also "proffer specific, tangible evidence" that she was treated differently. Philip v. Ford Motor Co., 413 F.3d 766, 768 (8th Cir. 2005).

Smith relies on blanket allegations in an attempt to identify similarly situated employees. She asserts that Reed allowed non-minority employees to leave work early and receive time off for illness. Smith Dep. at 177:10-180:18. Smith has failed, however, to provide specific, tangible evidence relating to those employees, the standards to which they were held, Reed's failure to discipline them as she disciplined Smith, or any specific instances of alleged disparate treatment. Accordingly, Smith has failed to establish a prima facie case of race discrimination.

Even if she had done so, summary judgment for Mayo is appropriate because Smith has failed to show that her termination was mere pretext for racial discrimination. Once an employee has made a prima facie showing of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for termination. McDonnell Douglas Corp., 411 U.S. at 802-03. Mayo has met its burden by asserting that it terminated Smith for

her poor attendance record.   Once a defendant has articulated a legitimate reason for termination, the burden once again shifts to the plaintiff to show that the articulated reason for termination was purely pretextual.   Id. at 803.   Smith may establish pretext by showing that "discriminatory animus more likely motivated" Mayo's decision to terminate her than its stated reason of her attendance issues.   Guimaraes v. Supervalu, Inc., 674 F.3d 962, 975 (8th Cir. 2012).

As evidence of pretext, Smith argues that Mayo failed to follow its attendance policy, improperly gave her occurrences, and terminated her without following the required procedures for FMLA requests.   Even if true, however, Smith does not link Mayo's failure to follow its own procedure to a racially discriminatory animus.   As a result, summary judgment is warranted on Smith's claim of race discrimination under Title VII.

## III. Retaliation

Smith also raises a claim for retaliation under Title VII, alleging that her termination was the result of retaliation for filing reports with human resources.   To establish a prima facie case of retaliation under Title VII, Smith must show that (1) she engaged in a statutorily protected activity,[8] (2) an adverse

---

[8] Mayo argues that Title VII's 300-day time bar prohibits Smith from relying on protected activities before May 2, 2013. Mayo has cited no case law supporting that proposition.   Indeed, the law is to the contrary.   The relevant statute does not discuss a time limit on evidence of protected activities, but only on the

employment action was taken, and (3) there was a causal connection between the protected activity and the adverse employment action. Wright v. St. Vincent Health Sys., 730 F.3d 732, 737 (8th Cir. 2013). Moreover, an employee must show that "the desire to retaliate was the but for cause of her termination - that is, that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the [defendant]." Id. (citation and internal quotation marks omitted).

It is undisputed that Smith engaged in protected behavior by reporting her supervisors' alleged racial slurs and Hurtis' threatening email. Indeed, statutorily protected conduct includes opposing any employment practice that is unlawful under Title VII. See 42 U.S.C. § 2000e-3(a). It is similarly undisputed that Smith's termination was an adverse employment action.

Further, Smith has sufficiently tied her reports to the accrual of occurrences and her termination. Smith first began accruing occurrences less than a month after she reported her supervisors' discriminatory remarks and a week after Reed and Paulson allegedly warned her not to file any more reports. Further, Smith alleges that Guevara told her that Reed, Hurtis, and Knutson wanted her fired. Smith has also raised fact issues regarding Mayo's application of its attendance policy. Smith has demonstrated a causal connection between her protected activities

_____

"alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1).

14

and her termination, and has made a prima facie showing of retaliation.

Mayo responds that it had a legitimate, nondiscriminatory reason to terminate Smith's employment based on her attendance record. Such a reason may be legitimate and nondiscriminatory. See, e.g., Bennis v. Minn. Hockey Ventures Grp., LLP, No. 12-CV-341, 2013 WL 3305213, at *13 (D. Minn. June 28, 2013) (finding employer met its burden where, in part, employee "over-utilized" the company's flexible scheduling policies). As a result, the burden shifts back to Smith to establish pretext.

"An employee can prove that [her] employer's articulated justification for an adverse employment action is pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Pye v. Nu Aire, Inc., 641 F.3d 1011, 1021 (8th Cir. 2011) (citation and internal quotation marks omitted). Smith argues that she can demonstrate pretext based on the temporal connection between her complaints, the accrual of occurrences, and her supervisors' behavior towards her. The court agrees.

Before Smith's reports in September and October 2012, her work performance was satisfactory and she had no occurrences on her record. After her reports, however, Smith began accruing occurrences. The occurrences were doled out by Reed, one of the

supervisors she reported for inappropriate language.

After Smith reported the threatening email in which Hurtis stated that she "want[ed] to kill [Smith]," Mayo gave Smith a new supervisor, Knutson. However, the change in supervision did little to change Smith's situation. Knutson immediately subjected Smith to a Performance Improvement Plan drafted by Reed. In other words, Knutson only perpetuated Reed's retaliation against Smith.

According to Smith, retaliation for her reports ran even further up the chain of command. When Smith met with Reed and Paulson, who was in charge of the entire Cancer Office, they allegedly threatened Smith and warned her not to file reports against her supervisors. Those statements by Reed and Paulson point directly to a retaliatory animus for Smith's reports against her supervisors. That retaliatory animus was also present when Hurtis, another supervisor in the Cancer Office, hung a poster on her door and made a statement that could be reasonably interpreted as a threat to quell further complaints. See Pl.'s Opp'n Mem. Ex. K.

Finally, Smith has presented evidence which, when viewed in the light most favorable to her, would allow a reasonable fact-finder to at least infer that her supervisors were attempting to find other ways to terminate her. For example, Smith's supervisors attempted to overload her with work so that she appeared to underperform. In light of that evidence, an issue of

16

material fact remains as to whether Mayo's proffered reason for Smith's termination was pretextual.  As a result, summary judgment is not warranted on Smith's retaliation claim.

## IV.  FMLA

Smith also argues that Mayo violated her FMLA rights by terminating her after her return from her claimed FMLA leave.  The FMLA prohibits an employer "from interfering with, restraining, or denying an employee's exercise of ... any [FMLA] right." Stallings v. Hussman Corp., 447 F.3d 1041, 1050 (8th Cir. 2006).  To be entitled to FMLA leave, however, that leave must be due to a serious health condition, defined by the FMLA as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital ... ; or (B) continuing treatment by a health care provider."  29 U.S.C. § 2611(11).  A plaintiff's failure to show that she was eligible for FMLA leave is fatal to her FMLA claim.  Dalton v. ManorCare of West Des Moines Iowa, LLC, 782 F.3d 955, 959-60 (8th Cir. 2015).

Smith's absence on July 23, 2013, for which she was given an occurrence and eventually terminated, was not due to a serious health condition as defined by the FMLA.  The treating physicians diagnosed her with generalized abdominal pain or renal colic, the underlying source of which was unknown.[9]  The doctor treating her

_____

[9] Smith argues that fibromyalgia is a qualifying serious health condition.  While that may be the case in some circumstances, Smith's own primary care physician, who was familiar

at the hospital opined that no inpatient care was necessary. Clarey Decl. Ex. B, at 8. Moreover, Smith has not shown the need for any continuing treatment by a healthcare provider for her pain.

Smith argues that she visited several medical facilities over a four-day period seeking treatment and diagnosis of her abdominal pain. The record reveals that Smith sought diagnoses at her doctor's office, and at the hospital on July 22 and July 23, and again on July 25, 2013. See Clarey Decl. Exs. A-C. On her last visit, Smith reported feeling "much better"[10] and she has submitted no evidence that the condition, whatever it was, has bothered her further. Pl.'s Opp'n Mem. Exs. B, F; Clarey Decl. Ex. C. A medical condition that concludes after three consultations with a doctor evinces the kind of short-term illness that is not covered by the FMLA. Martyszenko v. Safeway, Inc., 120 F.3d 120, 123 (8th Cir. 1997); see also Dalton, 782 F.3d at 961. Because Smith's condition was not a serious health condition as defined by the FMLA, Mayo is entitled to summary judgment.

---

with her condition, did not attribute her pain to fibromyalgia. Similarly, the doctors at St. Mary's were aware of Smith's fibromyalgia, and yet were unable to attribute her abdominal pain to any specific condition.

[10] Smith attended nearly a full day of work on July 24, 2013. Pl.'s Opp'n Mem. Ex. O.

## CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that the motion for summary judgment [ECF No. 27] is granted in part and denied in part as set forth above.

Dated:  January 19, 2016.

s/David S. Doty
David S. Doty, Judge
United States District Court

19